**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

VITO A. PESCE, on behalf of         *
himself and all other similarly     *
situated,                           *
                                    *
              Plaintiff,            *
                                    *
         Vs                         *  11-cv-1379
                                    *
FIRST CREDIT SERVICES, INC., dba    *
ACCOUNTS RECEIVABLE TECHNOLOGIES,   *
                                    *
              Defendants.           *
_____*


              DEPOSITION OF FRANK RUSSO
              THURSDAY, NOVEMBER 17, 2011
                  WOODBRIDGE, NEW JERSEY
                  10:00 A.M. - 3:00 P.M.




REPORTER:
Charles R. Senders,
License No. 596
```

**Page 2**

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

VITO A. PESCE, on behalf of         *
himself and all other similarly     *
situated,                           *
                                    *
              Plaintiff,            *
                                    *
         Vs                         *  11-cv-1379
                                    *
FIRST CREDIT SERVICES, INC., dba    *
ACCOUNTS RECEIVABLE TECHNOLOGIES,   *
                                    *
              Defendants.           *
_____*
```

    T R A N S C R I P T of the stenographic notes of the proceedings in the above entitled matters, as taken by and before CHARLES R. SENDERS, Certified Shorthand Reporter (License No. 596) and Notary Public of the State of New Jersey, held at the offices of N.J. Steno, Inc., 171 Green Street, Woodbridge, New Jersey on Thursday, November 17, 2011, commencing at 10:00 in the morning, pursuant to notice.

**Page 3**

APPEARANCES:

Attorneys for the Plaintiff:

    KEOGH LAW, LTD.
    BY: KEITH J. KEOGH, ESQ.
    101 North Wacker Drive
    Suite 605
    Chicago, Illinois 60606
    866-726-1092
    (Via Telephone)

Attorneys for the Defendants:

    HINSHAW & CULBERTSON, LLP
    BY: JAMES C. VLAHAKIS, ESQ.
    222 North LaSalle Street
    Suite 300
    Chicago, Illinois 60606
    312-704-3000

**Page 4**

I N D E X

| EXAMINATION | PAGE |
|---|---|
| By: Mr. Keogh | 5, 148 |
| By: Mr. Vlahakis | 141 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 9 |
| Exhibit 2 | Affidavit of M. Leraris | 59 |
| Exhibit 3 | Series of Emails | 72 |
| Exhibit 4 | Series of Emails | 82 |
| Exhibit 5 | LiveVox Voice Portal | 93 |
| Exhibit 6 | First Set of Interrogatories | 96 |
| Exhibit 7 | Supplemental Answers | 101 |
| Exhibit 10 | Declaration of Frank Russo | 120 |

**Page 5**

```
 1   F R A N K  R U S S O, residing at 30 Sea Breeze
 2      Lane, Staten Island, New York  10307,
 3      being first duly sworn according to law by
 4      the Notary, testifies under oath as
 5      follows:
 6           MR. KEOGH:  Let the record reflect
 7   that this is a Federal Rules of Civil Procedure
 8   30(b)6 Deposition pursuant to notice to the
 9   court reporter on today's date, for the
10   Northern District of Illinois.
11   DIRECT EXAMINATION BY MR. KEOGH:
12      Q.   Mr. Russo, have you ever been
13   deposed before?
14      A.   Have I been deposed before-- can
15   you speak up?
16           MR. VLAHAKIS: I'm sorry, Keith, but
17   can I ask you to repeat it, because I'm not
18   hearing you very well..
19           MR. KEOGH:  Don't worry, I'll talk
20   slow.
21           (Whereupon, a short recess takes
22   place).
23      Q.   Mr. Russo, the question was, have
24   you ever been deposed before?
25      A.   Yes, I have.
```

**Page 6**

```
 1      Q.   How many times?
 2      A.   One time.
 3      Q.   What did that relate to?
 4      A.   It was a related matter to an
 5   employee lawsuit.
 6      Q.   That's it?
 7      A.   That's it, that's it.
 8      Q.   Even though you've been deposed
 9   before, I'll give you some general ground
10   rules.  Honestly, especially since we're doing
11   this telephonically I need you to answer
12   verbally.  Shaking of the heads or uh-huh or
13   ah-hum doesn't cut it, you understand?
14      A.   I do.
15           MR. VLAHAKIS:  Keith, quick
16   question for, are you speaking into a speaker
17   as well.
18           MR. KEOGH:  Yes.
19           MR. VLAHAKIS:  If you got off your
20   speaker, because now it's like double speaker.
21   You speak just into the phone, that's why I
22   think it sounds bad.
23           MR. KEOGH:  Is this better?
24           MR. VLAHAKIS:  The court reporter
25   is nodding, too, that this is better.
```

**Page 7**

```
 1      Q.   Then back to the general ground
 2   rules. Mr. Russo, if you answer a question
 3   I'll assume you understand it.  Is that fair?
 4      A.   Yes.
 5      Q.   Obviously, what we already talked
 6   about, if you don't hear the question or if I
 7   speak too fast, just ask me to rephrase it or
 8   repeat it and I will, okay?
 9      A.   Yes.
10      Q.   All right. Now, you already gave
11   your name and address.  Can you give me your
12   highest level of education?
13      A.   College degree.
14      Q.   In what?
15      A.   Finance, bachelor's from St. John's
16   University.
17      Q.   What year did you graduate?
18      A.   1990.
19      Q.   Do you have a BS or BA?
20      A.   BS.
21      Q.   Do you hold any other degrees?
22      A.   I'm sorry?
23      Q.   Do you hold any other degrees?
24      A.   I do not, no.
25      Q.   Do you hold any certifications,
```

**Page 8**

```
 1   professional certifications?
 2      A.   Can you explain that a little
 3   further to me.
 4      Q.   Sure. Realtor, you know,
 5   accountant, are you an accountant?
 6      A.   No, I don't.
 7      Q.   It would also include a type of
 8   certification in professional consumer
 9   protection compliance?
10      A.   You asked me as to certifications.
11   Do you wantme to answer?
12           MR. VLAHAKIS:  Let me put you on
13   hold.  Let me talk to Ron, see if I can do
14   better than this.
15           (Short recess takes place).
16      Q.   Let me start where we left off,
17   hopefully march through this. Mr. Russo, I'm
18   asking you about any certifications you held
19   and I gave you a of examples.  Do you hold any
20   certifications?
21      A.   No.
22      Q.   Do you have any education related
23   to information technologies?
24      A.   No.
25      Q.   Do you have any training relating
```

Page 105

1  A. Supplemental answer?
2  Q. Yes.
3  A. "Subject to and without waiving the
4  above objections, pursuant to FRCP 33(d), see
5  pdf and tiff documents produced via disk on
6  October 31, 2001, which contain contact numbers
7  submitted by consumers which were provided to
8  Defendant by its creditors/clents.
9  Investigation continues".
10 Q. Now, the answer provided all the
11 contacts you had regarding 3,113 persons?
12 A. Okay.
13 Q. My question was, are there other
14 contracts besides what was provided in that
15 disk?
16 A. Were those 3,113 on that disk, is
17 that your question?
18 Q. The question is, are there other
19 contracts?
20 MR. VLAHAKIS: Keith, are you
21 asking have we produced everything that we have
22 in hand to date?
23 MR. KEOGH: I'm sorry, you got cut
24 off because the phone picked up an incoming
25 call. I'll rephrase it.

Page 106

1  Q. Mr. Russo, let's take a step
2  backwards, do you understand that in this
3  litigation FCS has produced a spreadsheet of
4  238 persons called. That is the skip trace
5  list; correct?
6  A. Correct.
7  Q. What I mean by skip trace list,
8  cell phone numbers that were obtained by skip
9  trace as opposed to being-- what I mean by skip
10 trace list, the cell phone is obtained via skip
11 tracing rather than being obtained through the
12 creditors, the 238 persons?
13 A. Well, the creditors actually had
14 those phone numbers.
15 Q. Well, all of them?
16 A. From my initial investigation,
17 yeah, ninety-five percent of those phone
18 numbers were in the hands of our clients and
19 were given consent by that customer.
20 Q. Let's take a step back, if we're
21 talking about the same thing. FCS produced the
22 spreadsheet of 238 names?
23 A. Correct.
24 Q. Out of those 238, are those subset
25 of 3,183 persons and those 238 are in those

Page 107

1  those 3,183?
2  A. Yes.
3  Q. FCS provided a spreadsheet for the
4  238 persons?
5  A. Yes.
6  Q. It provided some contract
7  information for those 238 persons?
8  A. Yes. We are in the process of
9  getting a lot more. This is very, very
10 timely. There is one client that as of
11 yesterday just asked us to subpoena the
12 records. So, you know, it is going to take a
13 lot of time to get this documentation. We are
14 on a daily basis doing our level best to get as
15 many as we possibly can, on a daily basis. It
16 is lengthy. We have clients we have to deal
17 with. You know, there is a lot of work behind
18 this. But, yes, we will.
19 Q. I appreciate that. I'm trying to
20 figure out what you have in handwriting now and
21 then we can talk about what you expect to get
22 or are trying to get.
23 A. Sure.
24 Q. We're talking, as we sit here, of
25 what FCS has in hands right now?

Page 108

1  A. That's 3,183.
2  Q. Out of those 3,000 something-- 183
3  persons, what does FCS have in hand to show
4  consent for those 3,000 some persons?
5  A. So far 132.
6  Q. So you have documentation and
7  consent for 132 persons out of the 3,183?
8  A. We're knee deep in investigation.
9  We have-- this thing will continue to try to
10 get as many consents as we can possibly get.
11 But we're very confident that those consents do
12 exist.
13 Q. That's neither here nor there.
14 Right now I'm trying to nail down the numbers.
15 So we have 3,183 persons and FCS believes it as
16 documents showing consent for 132 right now?
17 A. We received back 132 documents.
18 Q. Which FCS believes shows consent;
19 correct?
20 A. Yes, a very high percentage, easily
21 at seventy-five percent and arriving by the
22 day.
23 Q. But the documents I'm talking about
24 where only for those 132 that you have?
25 A. Yes.

109

1  Q. So you received 132 documents
2  back. Right now seventy-five percent of the
3  132 show consent. Is that fair?
4  A. **We're not done with our**
5  **investigation yet.**
6  Q. I'm not there. If you can just
7  answer the question, we can get through this.
8  You can tell me what else you are doing
9  expecting to get consent for the rest of that.
10 You hope a truckload of documents arrives
11 tomorrow showing consent for every one.
12     I want to talk about what you have
13 right now, then we can talk about what steps
14 you re taking to get the balance of the
15 information, okay?
16 A. **Okay.**
17 Q. So I'm just going to reiterate what
18 I think we have here. So we have 3,183
19 persons; correct?
20 A. **Persons, yes, correct.**
21 Q.
22     MR. VLAHAKIS: So Keith, can you
23 stop, 3,183?
24     THE WITNESS:
25 A. **I'm sorry, I got 3,113.**

110

1  Q. 3,113. Thank you. So we have
2  3,113?
3  A. **Correct.**
4  Q. So far FCS has documents, 132
5  documents and seventy-five percent of which
6  show consent; correct?
7  A. **Yes.**
8  Q. Do you have an exact number rather
9  than just seventy-five percent?
10 A. **Say that again?**
11 Q. Do you know how much--of the 132,
12 exactly how many FCS believes show consent?
13 A. **I can get that for you.**
14 Q. Please. I know you were saying
15 seventy-five percent. You know, to me that
16 seventy-five percent is ninety-nine. Which
17 means that the others don't have consent right
18 now.
19 A. **I can get that for you.**
20 Q. But you believe it is around
21 seventy-five percent?
22 A. **It is a very high percent, well**
23 **into the seventy-five range.**
24 Q. So, one second here. So for the
25 other 2,908 persons, I have to calculate, see

111

1  if that's the right number--
2  A. **Hold on, what was the number you**
3  **gave me?**
4  Q. 2,980?
5     MR. VLAHAKIS: Stop talking over
6  each other.
7  A. **2,980, plus 132, 3,112. Actually,**
8  **it is 2,989 plus 132, comes out to 3,113, minus**
9  **132. So the exact number is 2,981. That's the**
10 **exact number.**
11 Q. All right. So for those 2,981
12 persons--
13 A. **Yes.**
14 Q. --FCS is still waiting for
15 information to show consent. Is that fair?
16 A. **Yes.**
17 Q. You mentioned you just received
18 documents. What creditor asked you to subpoena
19 them?
20 A. **I'm sorry, say that again?**
21 Q. A moment ago you mentioned some
22 creditor requested that FCS subpoena them?
23 A. **I believe that was BMW.**
24 Q. Okay. Now, I'm going to go through
25 a list here that was given to me. Are you

112

1  still waiting for additional information from
2  Advanced Mercury?
3  A. **I can tell you, Keith, that we will**
4  **cooperate to our level best to get all of this**
5  **information. It is a very time consuming**
6  **process.**
7  Q. Okay.
8  A. **It is also a process that we can't**
9  **control. We got to kind of-- you know, it is**
10 **our client who is giving us this information.**
11 Q. Okay. Do you have any time frames
12 on when FCS believes it can obtain all the
13 information it needs to show whether there is
14 consent or not?
15 A. **I can tell you, Keith, those 132**
16 **took well over a month already. If you want to**
17 **do the math on that.**
18 Q. Well, what other creditors are
19 going to send you the documents or you just
20 don't know?
21 A. **I'm sorry?**
22 Q. I'm trying to figure out what
23 creditors had promised-- you said BMW. What
24 has Advanced Mercury told FCS?
25 A. **I don't know on a specific basis,**

129

1  paragraph twenty-three, please?
2      A.  I'm going to read it.
3      Q.  Please go, ahead.
4      A.  All right.
5      Q.  What does paragraph twenty-three
6  state?
7      A.  Do you want me to read it as stated
8  here?
9      Q.  Yes, if you want, or you can
10 summarize?
11     A.  "When Nuvell/GMAC transmitted this
12 account for collection to FCS, it provided two
13 numbers as plaintiff's contact number. 847 and
14 312. See Exhibit D, placement records and
15 Exhibit E (GMAC code sheet identifying 166-181
16 as the code from a home number)".
17     Q.  The 847 number that you referred
18 to, the last four digits are 9705; correct?
19     A.  Yes.
20     Q.  It is your understanding, as you
21 sit here today, that is Mr. Pesce's cell phone
22 number?
23     A.  Yes.
24     Q.  So FCS' contention is that GMAC
25 provided Mr. Pesce's cell phone number to FCS

130

1  to call; correct?
2      A.  Mr. Pesce, absolutely, gave his
3  cell number to our client, without a doubt.
4      Q.  All right. What are you basing that
5  on?
6      A.  Lots of things. Number one, our
7  client GMAC never did, based on the discovery,
8  the information that was looked at, they never
9  did any call capture to get that cell phone
10 number. There is no evidence at all indicating
11 that our client, GMAC, did any skip tracing to
12 obtain that cell phone number.
13         On top of that, it is common
14 procedure for creditors, not just our clients,
15 but for creditors across the country, that when
16 a customer calls in or they contact somebody,
17 it is very customary that they will first seek
18 to update contact addresses, information from
19 that customer.
20         On top of that, your client, Mr.
21 Pesce was so concerned about his credit report
22 and wrote numerous letters back and forth to
23 our client, do you really think that Mr. Pesce
24 would not have given his cell phone number to
25 call back so that our client can resolve this

131

1  matter for him, when he was absolutely upset
2  about his credit report like this? He have
3  that cell phone number, without a doubt.
4          On top of that, his wife calls in
5  and she--I just want to finish this. His wife
6  calls in and she provides GMAC with the cell
7  phone phone. Number which clearly shows that
8  his wife gave a cell phone number of her own.
9  Which shows that GMAC could have updated that
10 information right there at that point as well.
11     Q.  Okay. Is that it?
12     A.  So I'm going to say it one more
13 time, I want an exclamation mark on this one.
14 Mr. Pesce gave the cell phone number with
15 consent, exclamation mark.
16     Q.  Well, if it is only that simple we
17 wouldn't be here, would we?
18     A.  I think it is that simple.
19     Q.  All right. Just to be clear, when
20 you are referring to Ms. Pesce calling, giving
21 her cell phone, there is no record of her
22 giving the 9705 number, is there?
23     A.  There isn't.
24     Q.  There is no record of GMAC
25 verifying how the information from Mr. Pesce,

132

1  that he gave the 9705 information, is there?
2      A.  There is no indication of it right
3  now. But I can tell you this investigation to
4  get that is not over, my friends.
5      Q.  All right. Well we'll deal with it
6  if it comes up later. Just let's just deal
7  with it what we have now?
8      A.  Right it is not over.
9      Q.  Do you have any communications from
10 Mr. Pesce or have a mailing list, any documents
11 of Mr. Pesce, giving the number 9705?
12     A.  I don't believe so.
13     Q.  Are there any notations or any
14 documents from GMAC showing that Mr. Pesce
15 provided that 9705 number?
16     A.  I did not see that.
17     Q.  So it seems to me that your
18 exclamation point, to give it, is all based
19 upon your belief that they had to get it from
20 somewhere and it probably happened; am I wrong?
21     A.  It is there, Keith and we'll find
22 it.
23     Q.  You are saying find it. Meaning
24 you don't have it right now; correct?
25     A.  We don't have it right now. But I

157

1 DECLARATION UNDER PENALTY OF PERJURY
2
3
4
5     I hereby certify under penalty of perjury that I
6  have read the foregoing transcript of my deposition;
7  that I have made such corrections as appear noted
8  herein in ink, initialed by me; that my testimony as
9  contained herein, as corrected, is true and correct.
10
11     DATED this _____ day of _____, 2011,
12  at _____, _____.
13
14
15
16
17
18
19     _____
20          Deponent
21
22
23
24
25

158

1            C E R T I F I C A T E
2
3     I, CHARLES R. SENDERS, a Certified
4  Shorthand Reporter and Notary Public of the
5  State of New Jersey, do hereby certify that
6  prior to the commencement of the examination,
7  the witness was duly sworn by me to testify to
8  the truth, the whole truth and nothing but the
9  truth.
10     I DO FURTHER CERTIFY that the foregoing is
11  a true and accurate transcript of the testimony
12  as taken stenographically by and before me at
13  the time, place and on the date hereinbefore
14  set forth, to the best of my ability.
15     I DO FURTHER CERTIFY that I am neither
16  a relative nor employee nor attorney nor
17  counsel of any of the parties to this action,
18  and that I am neither a relative nor employee
19  of such attorney or counsel, and that I am not
20  financially interested in the action.
21
22
23
24     _____
25     CHARLES R. SENDERS, CSR NO. 596.