# EXHIBIT 3

**1**

```
1              IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF ILLINOIS
3                       EASTERN DIVISION
4
5    VITO A. PESCE, on behalf of     *
     himself and all other similarly *
6    situated,                       *
                                     *
7                   Plaintiff,       *
                                     *
8           Vs                       *  11-cv-1379
                                     *
9    FIRST CREDIT SERVICES, INC., dba *
     ACCOUNTS RECEIVABLE TECHNOLOGIES,*
10                                   *
                    Defendants.      *
11   _____  *
12
13
14
15             DEPOSITION OF FRANK RUSSO
16           THURSDAY, NOVEMBER 17, 2011
17              WOODBRIDGE, NEW JERSEY
18              10:00 A.M. - 3:00 P.M.
19
20
21
22
23   REPORTER:
24   Charles R. Senders,
25   License No. 596
```

**2**

```
1         IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF ILLINOIS
3                 EASTERN DIVISION
4
5    VITO A. PESCE, on behalf of     *
     himself and all other similarly *
6    situated,                       *
                                     *
7             Plaintiff,             *
                                     *
8         Vs            * 11-cv-1379
                                     *
9    FIRST CREDIT SERVICES, INC., dba *
     ACCOUNTS RECEIVABLE TECHNOLOGIES,*
10                                   *
                Defendants.          *
11   _____  *
12
13
14
15        T R A N S C R I P T of the stenographic
16   notes of the proceedings in the above entitled
17   matters, as taken by and before CHARLES R.
18   SENDERS, Certified Shorthand Reporter (License
19   No. 596) and Notary Public of the State of New
20   Jersey, held at the offices of N.J. Steno,
21   Inc., 171 Green Street, Woodbridge, New Jersey
22   on Thursday, November 17, 2011, commencing at
23   10:00 in the morning, pursuant to notice.
24
25
```

**3**

```
1    A P P E A R A N C E S :
2    Attorneys for the Plaintiff:
3        KEOGH LAW, LTD.
         BY: KEITH J. KEOGH, ESQ.
4        101 North Wacker Drive
         Suite 605
5        Chicago, Illinois 60606
         866-726-1092
6        (Via Telephone)
7    Attorneys for the Defendants:
8        HINSHAW & CULBERTSON, LLP
         BY: JAMES C. VLAHAKIS, ESQ.
9        222 North LaSalle Street
         Suite 300
10       Chicago, Illinois 60606
         312-704-3000
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1                I N D E X
2    EXAMINATION                      PAGE
3    By: Mr. Keogh              5, 148
4    By: Mr. Vlahakis              141
5
6
7
8
9
10               E X H I B I T S
11   NUMBER         DESCRIPTION        PAGE
12   Exhibit 1    Notice of Deposition       9
13   Exhibit 2    Affidavit of M. Leraris    59
14   Exhibit 3    Series of Emails           72
15   Exhibit 4    Series of Emails           82
16   Exhibit 5    LiveVox Voice Portal         93
17   Exhibit 6    First Set of Interrogatories  96
18   Exhibit 7    Supplemental Answers        101
19   Exhibit 10   Declaration of Frank Russo  120
20
21
22
23
24
25
```

f2a6d167-41e7-42bb-b5f2-ae11e4c4b84c

---

109

1    Q.    So you received 132 documents
2    back.  Right now seventy-five percent of the
3    132 show consent.  Is that fair?
4    **A.    We're not done with our**
5    **investigation yet.**
6    Q.    I'm not there.  If you can just
7    answer the question, we can get through this.
8    You can tell me what else you are doing
9    expecting to get consent for the rest of that.
10   You hope a truckload of documents arrives
11   tomorrow showing consent for every one.
12   I want to talk about what you have
13   right now, then we can talk about what steps
14   you re taking to get the balance of the
15   information, okay?
16   **A.    Okay.**
17   Q.    So I'm just going to reiterate what
18   I think we have here.  So we have 3,183
19   persons; correct?
20   **A.    Persons, yes, correct.**
21   Q.
22   MR. VLAHAKIS:  So Keith, can you
23   stop, 3,183?
24   THE WITNESS:
25   **A.    I'm sorry, I got 3,113.**

---

110

1    Q.    3,113.  Thank you.  So we have
2    3,113?
3    **A.    Correct.**
4    Q.    So far FCS has documents, 132
5    documents and seventy-five percent of which
6    show consent; correct?
7    **A.    Yes.**
8    Q.    Do you have an exact number rather
9    than just seventy-five percent?
10   **A.    Say that again?**
11   Q.    Do you know how much--of the 132,
12   exactly how many FCS believes show consent?
13   **A.    I can get that for you.**
14   Q.    Please.  I know you were saying
15   seventy-five percent.  You know, to me that
16   seventy-five percent is ninety-nine.  Which
17   means that the others don't have consent right
18   now.
19   **A.    I can get that for you.**
20   Q.    But you believe it is around
21   seventy-five percent?
22   **A.    It is a very high percent, well**
23   **into the seventy-five range.**
24   Q.    So, one second here.  So for the
25   other 2,908 persons, I have to calculate, see

---

111

1    if that's the right number--
2    **A.    Hold on, what was the number you**
3    **gave me?**
4    Q.    2,980?
5    MR. VLAHAKIS:  Stop talking over
6    each other.
7    **A.    2,980, plus 132, 3,112.  Actually,**
8    **it is 2,989 plus 132, comes out to 3,113, minus**
9    **132.  So the exact number is 2,981.  That's the**
10   **exact number.**
11   Q.    All right.  So for those 2,981
12   persons--
13   **A.    Yes.**
14   Q.    --FCS is still waiting for
15   information to show consent.  Is that fair?
16   **A.    Yes.**
17   Q.    You mentioned you just received
18   documents.  What creditor asked you to subpoena
19   them?
20   **A.    I'm sorry, say that again?**
21   Q.    A moment ago you mentioned some
22   creditor requested that FCS subpoena them?
23   **A.    I believe that was BMW.**
24   Q.    Okay.  Now, I'm going to go through
25   a list here that was given to me.  Are you

---

112

1    still waiting for additional information from
2    Advanced Mercury?
3    **A.    I can tell you, Keith, that we will**
4    **cooperate to our level best to get all of this**
5    **information.  It is a very time consuming**
6    **process.**
7    Q.    Okay.
8    **A.    It is also a process that we can't**
9    **control.  We got to kind of-- you know, it is**
10   **our client who is giving us this information.**
11   Q.    Okay.  Do you have any time frames
12   on when FCS believes it can obtain all the
13   information it needs to show whether there is
14   consent or not?
15   **A.    I can tell you, Keith, those 132**
16   **took well over a month already.  If you want to**
17   **do the math on that.**
18   Q.    Well, what other creditors are
19   going to send you the documents or you just
20   don't know?
21   **A.    I'm sorry?**
22   Q.    I'm trying to figure out what
23   creditors had promised-- you said BMW.  What
24   has Advanced Mercury told FCS?
25   **A.    I don't know on a specific basis,**

f2a6d167-41e7-42bb-b5f2-ae11e4c4b84c

121

1    about Document 36-7, filed 8/9/11.  That's the
2    signature page?
3            MR. KEOGH:  Yes.
4        Q.    Mr. Russo, are you on page seven of
5    thirty?
6        A.    Yes.
7        Q.    There is a name Frank Russo there.
8    Do you see that?
9        A.    I do.
10       Q.    Then there is not a signature, but
11   there is a Frank Russo cursive or title there.
12   Do you see that?
13       A.    I do.
14       Q.    Did you sign this document?
15       A.    Yes.
16       Q.    How did you sign this document?
17       A.    I don't remember.
18       Q.    Well, you signed a version of this
19   document via handwriting?
20       A.    I really don't remember how we did
21   it, to be honest with you.  But I do recall
22   this, absolutely.
23       Q.    Okay. Turning to the first page,
24   Declaration of Frank Russo, who prepared this
25   document?

122

1        A.    Declaration of Frank Russo?
2        Q.    Yes, sir.
3        A.    What would you be--
4        Q.    Who prepared it?
5        A.    Who prepared it?
6        Q.    Yes.
7        A.    I would imagine my attorney did.
8        Q.    Okay. Did you make any revisions to
9    the affidavit?
10       A.    I didn't make any revisions.  I
11   don't recall making any revisions.
12       Q.    So, going to paragraph seven, which
13   is on page three of thirty of your affidavit,
14   "during the relevant time period"?
15       A.    Yeah, I'm readking it now.
16       Q.    Okay.  Now, am I correct that
17   number should be modified as 3,113 calls rather
18   than 6,381?
19       A.    Yes.
20       Q.    So during the relevant time period
21   of the proposed class, January 1st, 2010 and
22   February 28th 2011, FCS called 3,113 cell phone
23   numbers in Illinois.  Is that correct?
24       A.    No.
25            MR. VLAHAKIS: Keith, can I help

123

1    you hear?
2            MR. KEOGH:  Sure.
3            MR. VLAHAKIS:  We gave you the
4    3,113.  That was persons as opposed to cell
5    phone numbers.
6        A.    The interrogatory I saw after the
7    fact, required us to identify the persons not
8    the cell phone numbers.  Does that make sense.
9        Q.    In part, yeah.  So then I guess the
10   question is, taking a step backwards from this
11   affidavit, how many cell phone numbers were
12   were there for the 3,113 persons?
13       A.    I believe, didn't we just cover
14   that?
15            MR. VLAHAKIS:  Are you asking total
16   cell phone calls placed or numbers associated
17   with these persons?
18            MR. KEOGH:  Cell phone numbers
19   associated with the persons.
20            THE WITNESS:  So that would be
21   3,113-- hold on, read that question to me
22   again, please. There are so many numbers going
23   on.
24       Q.    That's fine.  We had we established
25   that due to some duplicate information the

124

1    correct number of persons called on the cell
2    phone were 3,113; correct?
3        A.    3,113 people, yes.
4        Q.    How many cell phone numbers?
5        A.    3,113.
6        Q.    So there is no person with more
7    than one cell phone number?
8        A.    I don't believe so, no.
9        Q.    So back to paragraph seven, I'll
10   read it.  I'll twitch the number. I want you
11   to tell me if I'm correct.  During the relevant
12   time period of the proposed class, January 20,
13   2010 and February 28, 2011, FCS called 3,113
14   cell phone numbers in Illinois.  Is that
15   correct?
16       A.    That's correct.
17       Q.    And then if we added, for a total
18   of 164,317 times.  Is that correct?
19       A.    That's what we said.  It was--
20   didn't we say 164,317.
21       Q.    I believe so. All right.
22            MR. VLAHAKIS:  I may have to clear
23   this up later, Keith, in case you want to keep
24   going down this road.
25            MR. KEOGH:  Understood.

f2a6d167-41e7-42bb-b5f2-ae11e4c4b84c

129

1 paragraph twenty-three, please?
2     **A.   I'm going to read it.**
3     Q.   Please go, ahead.
4     **A.   All right.**
5     Q.   What does paragraph twenty-three
6 state?
7     **A.   Do you want me to read it as stated**
8 **here?**
9     Q.   Yes, if you want, or you can
10 summarize?
11     **A.   "When Nuvell/GMAC transmitted this**
12 **account for collection to FCS, it provided two**
13 **numbers as plaintiff's contact number. 847 and**
14 **312. See Exhibit D, placement records and**
15 **Exhibit E (GMAC code sheet identifying 166-181**
16 **as the code from a home number)".**
17     Q.   The 847 number that you referred
18 to, the last four digits are 9705; correct?
19     **A.   Yes.**
20     Q.   It is your understanding, as you
21 sit here today, that is Mr. Pesce's cell phone
22 number?
23     **A.   Yes.**
24     Q.   So FCS' contention is that GMAC
25 provided Mr. Pesce's cell phone number to FCS

130

1 to call; correct?
2     **A.   Mr. Pesce, absolutely, gave his**
3 **cell number to our client, without a doubt.**
4     Q.   All right. What are you basing that
5 on?
6     **A.   Lots of things. Number one, our**
7 **client GMAC never did, based on the discovery,**
8 **the information that was looked at, they never**
9 **did any call capture to get that cell phone**
10 **number. There is no evidence at all indicating**
11 **that our client, GMAC, did any skip tracing to**
12 **obtain that cell phone number.**
13        **On top of that, it is common**
14 **procedure for creditors, not just our clients,**
15 **but for creditors across the country, that when**
16 **a customer calls in or they contact somebody,**
17 **it is very customary that they will first seek**
18 **to update contact addresses, information from**
19 **that customer.**
20        **On top of that, your client, Mr.**
21 **Pesce was so concerned about his credit report**
22 **and wrote numerous letters back and forth to**
23 **our client, do you really think that Mr. Pesce**
24 **would not have given his cell phone number to**
25 **call back so that our client can resolve this**

131

1 **matter for him, when he was absolutely upset**
2 **about his credit report like this?  He have**
3 **that cell phone number, without a doubt.**
4        **On top of that, his wife calls in**
5 **and she--I just want to finish this. His wife**
6 **calls in and she provides GMAC with the cell**
7 **phone phone.  Number which clearly shows that**
8 **his wife gave a cell phone number of her own.**
9 **Which shows that GMAC could have updated that**
10 **information right there at that point as well.**
11     Q.   Okay. Is that it?
12     **A.   So I'm going to say it one more**
13 **time, I want an exclamation mark on this one.**
14 **Mr. Pesce gave the cell phone number with**
15 **consent, exclamation mark.**
16     Q.   Well, if it is only that simple we
17 wouldn't be here, would we?
18     **A.   I think it is that simple.**
19     Q.   All right. Just to be clear, when
20 you are referring to Ms. Pesce calling, giving
21 her cell phone, there is no record of her
22 giving the 9705 number, is there?
23     **A.   There isn't.**
24     Q.   There is no record of GMAC
25 verifying how the information from Mr. Pesce,

132

1 that he gave the 9705 information, is there?
2     **A.   There is no indication of it right**
3 **now.  But I can tell you this investigation to**
4 **get that is not over, my friends.**
5     Q.   All right.  Well we'll deal with it
6 if it comes up later.  Just let's just deal
7 with it what we have now?
8     **A.   Right it is not over.**
9     Q.   Do you have any communications from
10 Mr. Pesce or have a mailing list, any documents
11 of Mr. Pesce, giving the number 9705?
12     **A.   I don't believe so.**
13     Q.   Are there any notations or any
14 documents from GMAC showing that Mr. Pesce
15 provided that 9705 number?
16     **A.   I did not see that.**
17     Q.   So it seems to me that your
18 exclamation point, to give it, is all based
19 upon your belief that they had to get it from
20 somewhere and it probably happened; am I wrong?
21     **A.   It is there, Keith and we'll find**
22 **it.**
23     Q.   You are saying find it.  Meaning
24 you don't have it right now; correct?
25     **A.   We don't have it right now.  But I**

f2a6d167-41e7-42bb-b5f2-ae11e4c4b84c