# EXHIBIT 4

```
IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
          EASTERN DIVISION
VITO A. PESCE, on behalf  )
of himself and all        )
others similarly situated,)
          Plaintiffs,     )
     vs.                  )  No. 11-cv-01379
FIRST CREDIT SERVICES,    )
INC. d/b/a ACCOUNTS       )
RECEIVABLE TECHNOLOGIES,  )
          Defendant.      )
```

The deposition of VITO PESCE, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Shannon R. Roberts, a notary public within and for the County of Will and State of Illinois, at 222 North LaSalle Street, Suite 300, Illinois, on July 25, 2011, at the hour of 1:24 p.m.
Reported by: Shannon R. Roberts, CSR
License No.: 084-004669

1

### I N D E X

| WITNESS | EXAMINATION |
|---|---|
| VITO PESCE | |
| BY MR. VLAHAKIS | 5 |
| BY MR. KEOGH | 54 |
| FURTHER BY MR. VLAHAKIS | 59 |

### E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| PESCE Deposition Exhibit | |
| No. 1 | 6 |
| No. 2 | 8 |
| No. 3 | 10 |
| No. 4 | 19 |
| No. 5 | 32 |
| No. 6 | 49 |

3

APPEARANCES:

  KEOGH LAW, LTD.
  BY: MR. KEITH J. KEOGH
  101 North Wacker Drive
  Suite 605
  Chicago, Illinois 60606
  (312) 780-7363
      Representing the Plaintiffs;

  HINSHAW & CULBERTSON, LLP
  BY: MR. JAMES C. VLAHAKIS
  222 North LaSalle Street
  Suite 300
  Chicago, Illinois 60601
  (312) 704-3000
      Representing the Defendant.

2

        (WHEREUPON, the witness was duly sworn.)
   MR. VLAHAKIS: Could you state your full name for the record, please.
   THE WITNESS: Vito Angelo Pesce.
   MR. VLAHAKIS: Mr. Pesce, have you ever given a deposition before?
   THE WITNESS: Yes.
   MR. VLAHAKIS: What case was that involving?
   THE WITNESS: It was a traffic accident.
   MR. VLAHAKIS: So it was a pretty quick deposition?
   THE WITNESS: Yes, very quick.
   MR. VLAHAKIS: I just want to lay down some ground rules. That's why I was asking. Typically, we ask that you wait until I'm done asking the question before you give your answer. That allows the court reporter to take down testimony a lot easier.
       Do you understand that?
   THE WITNESS: Uh-huh.
   MR. VLAHAKIS: And we need to say yes or no or verbal answers.
   THE WITNESS: Yes.

4

1 (Pages 1 to 4)

**Page 5**

1  MR. VLAHAKIS: If you don't understand a
2  question because it's either long, confusing or
3  it sounds like legalese, let me know and I'll
4  try to rephrase the question so to make sure
5  that when I'm asking you something, you fully
6  understand it before you give an answer.
7      Are you okay with that?
8  THE WITNESS: Yes.
9  MR. VLAHAKIS: If you need to take a break to
10 go to the bathroom, let me know, we can do that.
11 If you need the court reporter to read back a
12 prior answer, she can do that. If you want to
13 hear back my question, she can also do that.
14     Do you understand?
15 THE WITNESS: Yes.
16         VITO PESCE,
17 having been first duly sworn, was examined and
18 testified as follows:
19        EXAMINATION
20 BY MR. VLAHAKIS:
21   Q.  I would like to ask you a few quick
22 questions regarding some of the settlement
23 offers that have been made in this case. I have
24 made a copy of these letters for you and for

**Page 6**

1  your attorney.
2      This will be Exhibit 1.
3      (WHEREUPON, PESCE Deposition
4       Exhibit No. 1 was marked for
5       identification.)
6  THE WITNESS: I would like to go to the
7  restroom before we start.
8  MR. VLAHAKIS: If you want to go now, that's
9  fine.
10 MR. KEOGH: Why don't you go now before he
11 asks you a question.
12 THE WITNESS: Okay.
13     (WHEREUPON, a short break was
14      taken.)
15 MR. KEOGH: I just want to state for the
16 record Exhibit 1 is a settlement letter.
17 Pursuant to Rule 408, any settlement discussions
18 is non-discoverable and won't lead to relevant
19 information. With that general objection to any
20 questions regarding this, you can ask your
21 questions.
22 MR. VLAHAKIS: Fair enough. I agree with the
23 concept that these would be arguably
24 confidential. The scope might be decided at a

**Page 7**

1  later date under 408, but I have no intention to
2  having these published in the public record at
3  this time.
4      I'm just going to ask a very limited
5  amount of questions of you, Mr. Pesce.
6  BY MR. VLAHAKIS:
7    Q.  Mr. Pesce, have you seen this document
8  before today's deposition?
9    A.  Yes.
10   Q.  Do you recall when you saw it?
11   A.  I believe it was the same day it was
12 issued.
13   Q.  And how did you receive a copy of this
14 letter?
15   A.  Electronic.
16   Q.  And if you need time to refamiliarize
17 yourself with the document, you can go ahead and
18 review it and tell me when you're done looking
19 it over.
20   A.  I'm pretty familiar with it.
21   Q.  Okay. In Paragraph 1 of this letter,
22 you see a statement regarding a confidential
23 payment to plaintiff. Do you understand that
24 that payment amount that's identified there was

**Page 8**

1  an offer that my client made to you to settle
2  your TCPA claims?
3    A.  I understand.
4    Q.  And am I correct that you rejected that
5  settlement overture that's contained in
6  Paragraph 1 of this July 18, 2011 letter?
7    A.  Yes.
8    Q.  Without revealing any attorney/client
9  privilege communications you had with your
10 attorney, could you explain to me why you
11 rejected the settlement figure that's identified
12 in Paragraph 1 of the July 18, 2011 letter?
13   A.  Well, it's a class case. It's not
14 about me individually.
15   Q.  Anything else other than that?
16   A.  That's pretty much it.
17   Q.  I'd like to show you copies of an
18 exhibit marked as 2.
19     (WHEREUPON, PESCE Deposition
20      Exhibit No. 2 was marked for
21      identification.)
22 MR. KEOGH: For the record Exhibit 2 is also
23 a settlement letter and I will object pursuant
24 to 408. I don't think it's relevant -- related

**Page 53**

1 answer today to the various questions I asked
2 you where it seemed like your answer was you
3 don't recall?
4     A. Just maybe being a little more cautious
5 in my answering.
6     Q. Did you review your notes in
7 preparation for today's deposition?
8     A. I did.
9     Q. Did you bring them with you at all?
10     A. No, I did not.
11     Q. But your attorney does have copies of
12 them?
13     A. Yes.
14     Q. Is your more accurate answer today that
15 you don't recall or do you believe that your
16 answer in Paragraph 13 that you never provided
17 your cell phone number is the more accurate
18 answer?
19     A. I believe I never provided my cell
20 phone number.
21     Q. Did you specifically review your notes
22 today to determine whether or not there's a
23 mention in your notes regarding your cell phone?
24     A. I did not review my notes today.

**Page 54**

1     MR. VLAHAKIS: I think I'm almost done, but
2 there's one document I want to look at that
3 I didn't bring down.
4       If we can take five minutes?
5     MR. KEOGH: Sure.
6       (WHEREUPON, a short break was
7       taken.)
8     MR. VLAHAKIS: I'm done. Go ahead.
9       EXAMINATION
10 BY MR. KEOGH:
11     Q. Mr. Pesce, counsel asked you what you
12 do for a living. You said IT management. Can
13 you elaborate, please?
14     A. Data center management, telephony
15 oversight, databases, software.
16     Q. For what company?
17     A. CNA Insurance.
18     Q. And as part of that oversight for
19 database management and telephony, do you have
20 any experience dealing with preemptive dialers
21 or auto dialers?
22     A. I'm familiar with them.
23     Q. You're familiar with them as part of
24 your employment?

**Page 55**

1     A. Correct.
2     Q. And you understand the power of an auto
3 dialer or preemptive dialer and how often they
4 can reach a person?
5     A. Correct.
6     Q. Now, counsel showed you a collection of
7 notes from his client as Exhibit 3. Can you
8 grab those, please? Can you turn to the second
9 page? He asked you a variety of questions
10 regarding the -- a March 9 and March 16 entry,
11 correct?
12     A. Correct.
13     Q. And I believe you testified you weren't
14 sure about the dates, but you did speak to them
15 a couple times, correct?
16     A. Correct.
17     Q. One, a Lisa Henry at least once; is
18 that correct?
19     A. Correct.
20     Q. Now, putting aside the dates, take a
21 look at the March 9 entry. Is it true that
22 you're asking for written verification of the
23 debt?
24     A. Yes.

**Page 56**

1     Q. Is there any mention of you asking them
2 to call back your cell phone?
3     A. No.
4     Q. What are you asking for according to
5 these notes?
6     A. I wanted the physical proof that I owed
7 the debt.
8     Q. Would a call back been good enough for
9 you?
10     A. No.
11     Q. According to these notes, you called
12 back again on March 16; is that correct?
13     A. Correct.
14     Q. And it's correct not as to the date,
15 but as to the fact that you did call back?
16     A. Yes.
17     Q. And, once again, what did you ask for
18 on that second call?
19     A. Documents proving that I owed the debt.
20     Q. And if they called you back saying we
21 checked, you owed a debt, would that have been
22 good enough?
23     A. No, it would not.
24     Q. Is there any reason at this point for

**Page 57**

1  you to provide Fair [sic] Credit Services your
2  cell phone number?
3     A. No.
4     Q. And did you provide Fair [sic] Credit
5  Services your cell phone number?
6     MR. VLAHAKIS: Objection, asked and answered.
7     THE WITNESS: No. They obviously had it if
8  you look at the notes.
9  BY MR. KEOGH:
10    Q. And you said they obviously had it. If
11 you turn to the first page of Exhibit 3, it
12 shows a phone call to (847) 809-9705; is that
13 correct?
14    A. Yes.
15    Q. And that's -- there's a date of
16 March 3; is that correct, on that circled entry
17 showing the call?
18    A. March 1.
19    Q. Sorry. Thank you.
20       In that group exhibit, which I believe
21 is Exhibit 5, counsel asked you to look at two
22 letters that you wrote Nuvell; do you recall
23 those questions?
24    A. Yes.

**Page 58**

1     Q. I'm going to hand you those two letters
2  dated March 1, 2010, and March 17, 2010. Would
3  you take a second to look at those documents?
4     A. Okay.
5     Q. Now, what are those documents
6  requesting?
7     A. Proof.
8     Q. Proof of what?
9     A. Proof that I owed the debt.
10    Q. And you're asking Nuvell to send you
11 proof, correct?
12    A. Correct.
13    Q. Did you provide any phone numbers on
14 those letters?
15    A. No, I did not.
16    Q. Why not?
17    A. Well, I wanted hard-copy proof, and
18 I don't just give out my cell phone willy-nilly.
19 But I basically wanted hard-copy proof that
20 I owed this debt and that Nuvell -- I never
21 heard of Nuvell. I don't even know who that
22 company is. Even today they're supposedly not
23 even a company anymore, so I still don't know
24 who Nuvell is. I never paid Nuvell. I always

**Page 59**

1  paid Saab Financial. So I wanted hard-copy
2  proof that I owed the debt and you owned the
3  debt.
4     Q. You said you don't give out your cell
5  phone willy-nilly. What do you mean by that?
6     A. I'm cautious on it. It's even on the
7  Federal Do-not-call list.
8     Q. I believe you testified that you
9  reviewed the complaint in this case before it
10 was filed, correct?
11    A. Correct.
12    Q. Did you have access to your notes when
13 you were reviewing this complaint?
14    A. Yes.
15    MR. KEOGH: I have no further questions for
16 the witness.
17        FURTHER EXAMINATION
18 BY MR. VLAHAKIS:
19    Q. Mr. Pesce, do you have an understanding
20 of what the -- the amount of statutory damages
21 that the TCPA provides for each call to a cell
22 phone in violation of the TCPA?
23    MR. KEOGH: Objection, outside the scope of
24 cross. You can answer.

**Page 60**

1     THE WITNESS: I believe I seen some numbers,
2  but not --
3  BY MR. VLAHAKIS:
4     Q. Do you recall what number those may
5  have been?
6     A. I don't recall.
7     Q. Does $500 per violation ring a bell?
8     A. That could be.
9     Q. Do you have any understanding as to
10 whether damages can be trebled under the TCPA to
11 $1500 per call?
12    A. I'm not a hundred percent familiar with
13 the law.
14    Q. If you have an understanding that the
15 TCPA can award $500 per call, do you have an
16 understanding of what your maximum recovery
17 could be at the end of the case based on the
18 amount of calls to your cell phone?
19    A. Generally.
20    Q. What's your general understanding?
21    A. Anywhere between -- I don't even know.
22 Again, I said it's not about me. I don't care
23 about what numbers I get individually.
24    Q. So is it your understanding in terms of