# EXHIBIT 5

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VITO A. PESCE,          )
          Plaintiff,    )
     vs.                ) No. 1:11-CV-01379
FIRST CREDIT SERVICES, INC., )
          Defendant.    )

The deposition of LAURA PESCE, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Elizabeth L. Vela, a Notary Public within and for the County of Cook, State of Illinois, at 222 North LaSalle Street, Chicago, Illinois, on the 27th day of January, 2012, at the time of 10:53 a.m.

(Proceedings concluded at 11:28 a.m.)

Reported by: Elizabeth L. Vela, CSR
License No.: 084-003650

### Page 2

APPEARANCES:

    KEOGH LAW, LTD., by
    MR. KEITH J. KEOGH,
    101 North Wacker Drive, Suite 605
    Chicago, IL 60606
    (312) 780-7363
        Representing the Plaintiff,

    HINSHAW & CULBERTSON, by
    MR. JAMES C. VLAHAKIS,
    222 North LaSalle Street, Suite 300
    Chicago, IL 60601
    (312) 704-3000
        Representing the Defendant.

### Page 3

I N D E X

WITNESS                         EXAMINATION
LAURA PESCE
  BY MR. VLAHAKIS                    5

E X H I B I T S
NUMBER                          MARKED FOR ID
Exhibit
  No. 1                              8

### Page 4

1     (Witness sworn.)
2     MR. VLAHAKIS: Hi, Mrs. Pesce. My name is
3 James Vlahakis. I'm representing the defendant in
4 this case. Have you ever given a deposition
5 before?
6     THE WITNESS: No.
7     MR. VLAHAKIS: Okay. What I like to do is, I
8 like to set up some ground rules for you so you can
9 understand how the process happens and so we'll
10 have a good understanding and make this happen
11 quickly.
12     The first thing, the court reporter needs
13 you to give verbal answers. So nodding your head,
14 shaking your head isn't really something she can
15 take down. So usually, it's yes or no or verbal
16 answers. Do you understand that?
17     THE WITNESS: Yes.
18     MR. VLAHAKIS: Okay. I want you to wait until
19 I'm done asking the question before you give your
20 answer so it's easier for the court reporter to
21 take it down. Can you do that?
22     THE WITNESS: Yes.
23     MR. VLAHAKIS: And if you have any questions
24 about what I'm saying, if you don't understand my

**Page 9**

1  creditor that provided the loan to your husband to
2  lease the Saab vehicle?
3  A. Saab Financial.
4  Q. And do you have an understanding as to
5  whether your husband had automatic payments set up
6  for the leased vehicle through Saab Financial?
7  A. Yes.
8  Q. And was that automatic payment set up
9  through your husband's checking account or was that
10 set up through a joint checking account, if you
11 know?
12 A. Joint.
13 Q. And do you recall if there's any point in
14 time where you were concerned that an automatic
15 payment had not been made to Saab Financial?
16 A. I don't remember.
17 Q. Do you ever recall being -- receiving a
18 call on your cell phone from Saab Financial or any
19 other creditor related to the loan for this
20 vehicle?
21 A. Not that I recall.
22 Q. I understand that you don't recall
23 contacting Saab Financial or GMAC to inquire as to
24 whether an automatic payment went in, but do you

**Page 10**

1  have any reason to dispute the veracity of these
2  records that indicate that there was a call coming
3  from an 847 number ending in 9706?
4  A. Say that again.
5  Q. Okay. I understand your testimony is that
6  you don't recall calling in to Saab Financial or
7  GMAC.
8  A. Right.
9  Q. What I'm trying to understand, though, is
10 if you dispute the accuracy of these records, which
11 reflect that somebody did call in from a cell phone
12 or a telephone number ending in 9706 to inquire as
13 to whether a payment was made.
14 A. Do I dispute it? I don't know what you
15 mean. I don't remember the call, but if --
16 Q. Well, I guess an easier way of saying it
17 is, if this record reflects that a call was made
18 from the 9706 number to inquire about a payment, do
19 you dispute that this is an accurate record of what
20 may have taken place?
21 MR. KEOGH: Objection. It lacks foundation.
22 THE WITNESS: I mean, I don't know. I don't
23 know if -- I don't know what this is so --
24

**Page 11**

1  BY MR. VLAHAKIS:
2  Q. Okay. I can represent to you that
3  pursuant to a subpoena that we issued to
4  GMAC/Nuvell, they sent us these records, which
5  shows a screen capture from a program called
6  Debt Manager.
7  My understanding of these records are, and
8  your attorney may agree or disagree, is that they
9  reflect through time various contacts that may have
10 been made to various numbers regarding this
11 account.
12 And on this date, 7-21, it reflects that
13 there's a call coming in from 847, ending in 9706
14 to verify about a payment.
15 A. So you're saying this was recorded?
16 Q. It was typed into a computer system, yes.
17 And what I'm trying to understand from you is,
18 while you may not recall this, do you have any
19 reason to dispute that somebody may have recorded a
20 call coming in from you and typed it in or do you
21 want to claim that this might be a false record?
22 I'm just trying to understand what you feel about
23 this.
24 A. Well, I don't know if it's a false record.

**Page 12**

1  If it's here, I guess it happened.
2  Q. Okay. Fair enough. Have you ever
3  provided your -- let me make sure the record is
4  correct. What is your husband's cell phone number?
5  A. (847) 809-9705.
6  Q. Have you ever provided his cell phone
7  number ending in 9705 to Saab Financial?
8  A. No.
9  Q. Did you provide his cell phone number
10 ending in 9705 to Nuvell Credit?
11 A. No.
12 Q. Did you provide his cell phone number
13 ending in 9705 to GMAC Credit?
14 A. No.
15 Q. Have you had any discussions with your
16 husband regarding whether or not he provided his
17 cell phone number ending in 9705 to Saab Financial,
18 Nuvell Credit, or GMAC Credit?
19 A. No.
20 Q. Did your husband ever tell you that he
21 received a call on his cell phone related to an
22 alleged debt for the Saab vehicle?
23 A. No.
24 Q. Are you aware that your husband has filed

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

**Page 21**

1 received an automated call on his cell phone from
2 any other persons attempting to collect a debt
3 other than ART or Nuvell?
4    A. I don't know. I don't answer his phone.
5 How would I know?
6    Q. Well, he might tell you that he received
7 some kind of call.
8    A. Oh. No.
9    Q. And do you know what I mean by an
10 automated call?
11    A. Yeah.
12    Q. What is your understanding of an automated
13 call?
14    A. Well, it's recorded and it kind of clicks
15 first before it goes to somebody. I hate those.
16    MR. KEOGH: I don't think you'll find anybody
17 who likes it. James, you can't even say you like
18 automated calls.
19    MR. VLAHAKIS: Off the record.
20       (Discussion off the record.)
21 BY MR. VLAHAKIS:
22    Q. I want to make sure I understand your
23 testimony from earlier.
24       Is it your recollection that you never had

**Page 22**

1 a discussion with your husband where he may have
2 said something like how did ART get my cell phone
3 number?
4       And the reason I'm asking that is, it
5 seems like -- your husband testified in his
6 deposition he was not happy receiving information
7 about this alleged debt.
8       And I understand he wrote letters about
9 the debt, that he called people about the debt.
10 Probably on top of that, he didn't like the fact
11 that he got a call to his cell phone.
12    A. Well, he shouldn't.
13    Q. Fair enough. With all that in mind, did
14 he ever have a discussion with you regarding how he
15 believed ART may have gotten his cell phone number?
16    A. No. He just -- we have no idea, because
17 my number is it. My number goes on everything,
18 because I'm the main number. My number goes on all
19 contracts, bills. Everybody has to call me.
20    Q. Got it. So you're sort of in charge of --
21    A. Everything.
22    Q. -- the checkbook?
23    A. Everything.
24    Q. A smart way of doing things. And then, by

**Page 23**

1 you testifying to that, then you're basically
2 saying you're surprised that the call then went to
3 Mr. Pesce --
4    A. Exactly.
5    Q. -- since you normally are in charge of
6 putting your number down as the contact number?
7    A. Exactly.
8    Q. Okay. Like for instance, can you give me
9 an example of one or two entities that you may have
10 provided your cell phone number to as a contact,
11 for a Target card or for anything like that?
12    MR. KEOGH: Object. Irrelevant.
13    THE WITNESS: Mine?
14 BY MR. VLAHAKIS:
15    Q. Yeah.
16    A. Mine is the main number. Mine is the home
17 phone. So I have to use that.
18    Q. What do you mean when you say it's the
19 home phone?
20    A. It's the home phone. There's no home
21 phone.
22    Q. Oh. Got it. So your cell phone is --
23    A. I'm it.
24    Q. I understand.

**Page 24**

1    A. Yeah.
2    Q. Okay. Thanks.
3    A. When you call home, you get me. And I
4 don't even give mine out that freely so --
5    Q. Understood. Okay. This is a very
6 particular question then.
7       Did Mr. Pesce ever ask you something along
8 the lines of, honey, did I ever provide my cell
9 phone, do you recall me providing my cell phone,
10 anything like that?
11    A. No, not -- he wouldn't ask me something
12 like that.
13    Q. Are you aware of whether your husband's
14 ever provided his cell phone number as a contact
15 number for a contract or a lease or a credit card?
16    A. Not that I'm aware of. I've always been
17 with him.
18    Q. Did Mr. Pesce ever tell you whether he
19 updated his contact information with Nuvell to
20 identify his cell phone number as a contact number?
21    A. He wouldn't do that.
22    Q. Why?
23    A. Because he doesn't update anything.
24    Q. Sorry for the laugh.

```
 1    A.  Seriously.  I'm it.  He doesn't have a
 2  clue what's going on.
 3    Q.  Were you ever in Mr. Pesce's presence when
 4  he called Nuvell to complain about this alleged
 5  debt?
 6    A.  Yes.
 7    Q.  And was it on one or more calls where you
 8  may have been present?
 9    A.  I believe one.
10    Q.  What phone was your husband using when he
11  called Nuvell?
12    A.  Mine.
13    Q.  And were you ever present when your
14  husband spoke with ART about the alleged debt?
15    A.  No.
16    Q.  Did your husband ever tell you that he
17  called Nuvell on his cell phone?
18    A.  No.
19    Q.  Did your husband ever tell you whether he
20  called ART on his cell phone?
21    A.  No.
22    Q.  Did your husband ever discuss with you
23  whether he called ART from his work phone?
24    A.  No.
                                                  25
```

```
 1    Q.  Did your husband ever discuss with you
 2  whether he called Nuvell from his work phone?
 3    A.  No.
 4    Q.  And did your husband ever discuss whether
 5  he called GMAC Financial from his cell phone?
 6    A.  No.
 7    Q.  Did you ever witness your husband calling
 8  GMAC from his cell phone?
 9    A.  GMAC or Nuvell or ART or are they all one?
10    Q.  I'll ask it three ways and make it
11  clearer.
12        Did you ever witness your husband calling
13  GMAC on his cell phone?
14    A.  No.
15    Q.  Did you ever witness your husband calling
16  Nuvell on his cell phone?
17    A.  No.
18    Q.  Did you ever witness your husband calling
19  ART on his cell phone?
20    A.  No.
21    Q.  Okay.  Did you ever speak with Nuvell to
22  update your husband's contact information to
23  identify his cell phone?
24    A.  No.
                                                  26
```

```
 1    Q.  And the same question with regard to --
 2  I'm trying to get all the entities covered here.
 3        Did you ever call GMAC to update the
 4  contact information to identify your husband's cell
 5  phone?
 6    A.  No.
 7    Q.  With regard to the automated payments for
 8  the Saab vehicle, do you recall how much the
 9  payments were on a monthly basis?
10    A.  No.  It was just automatic.
11    Q.  Was that something that you would have set
12  up through your checking account?
13    A.  Through the checking account, yeah.
14    Q.  So you set up all automatic payments
15  through your checking account?
16    A.  Yes.
17    Q.  That sort of goes back to the fact that
18  you're in charge of the checkbook and all that?
19    A.  Right.
20    Q.  What bank do you use for your checking
21  accounts -- or checking account?
22    A.  Chase.
23    Q.  Chase?  Okay.  How long have you been a
24  customer of Chase?
                                                  27
```

```
 1    A.  I'm not sure.  10 -- I don't know.
 2    Q.  As far back as 2006?
 3    A.  Well, how long have we been in the house?
 4  10 years.  I don't know.  10, 15 years.
 5    Q.  Okay.  Do you recall if you had set up the
 6  automatic payment through Saab Financial or was it
 7  set up through Chase directly?
 8    A.  I don't remember.
 9    Q.  Do you still have the paperwork that you
10  may have processed to set up the automatic payment?
11    A.  No.
12    Q.  Why is that?
13    A.  The lease was over.
14    Q.  So you think you --
15    A.  Shredded.
16    Q.  Shredded?  Okay.
17    A.  Otherwise, I would have way too much
18  paper.
19    Q.  I can't remember if I asked this, but I
20  know you don't recall -- you testified you don't
21  recall calling in to check on a payment.
22        Do you ever recall receiving a phone call
23  verifying that a payment did go through for the
24  leased vehicle?
                                                  28
```

7 (Pages 25 to 28)